ROBERT PLATSHORN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROBERT MEINSTER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Platshorn v. Commissioner
Docket Nos. 26213-81, 26644-81, 29798-82
United States Tax Court
T.C. Memo 1992-694; 1992 Tax Ct. Memo LEXIS 740; 64 T.C.M. (CCH) 1457; December 7, 1992, Filed *740 Decision will be entered under Rule 155. For Robert Platshorn, pro se in docket Nos. 26213-81, 29798-82. For Robert Meinster, pro se in docket No. 26644-81. For Petitioners: Arthur W. Tifford, for the limited purpose of the testimony of Howard Blumin (a nonparty witness). For Howard Blumin (a nonparty witness): Michael J. Osman. For Respondent: Sergio Garcia-Pages. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: These consolidated cases were assigned to Special Trial Judge Stanley J. Goldberg pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. All section references are to the Internal Revenue Code in effect for the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GOLDBERG, Special Trial Judge: In these consolidated cases respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Docket No. 26213-81 -- Robert Platshorn: Addition to Tax
Taxable Year Ended
Deficiency
Sec. 6653(b)
December 31, 1976
$   319,296
$ 159,648
December 31, 1977
$ 1,773,864
$ 886,932
*741 Docket No. 29798-82 -- Robert Platshorn: Addition to Tax
Taxable Year Ended
Deficiency
Sec. 6653(b)
December 31, 1978
$ 179,733
$ 89,866
Docket No. 26644-81 -- Robert Meinster Addition to Tax
Taxable Year Ended
Deficiency
Sec. 6653(b)
December 31, 1976
$   262,144
$ 131,072
December 31, 1977
$ 1,595,492
$ 797,746
Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. The issues for decision are: (1) Whether respondent correctly determined that petitioners had unreported income in the amounts determined for each of their respective taxable years in issue, and (2) whether petitioners are liable for an addition to tax under section 6653(b) for each of their respective years in issue. Respondent's cash expenditure computations for petitioner Robert Platshorn (Platshorn) and petitioner Robert Meinster (Meinster), as set forth in the notices of deficiency and the pleadings and as reflecting the issues which remain after concessions, are summarized as follows: Docket No. 26213-81 -- Robert Platshorn: Remaining
Adjustments to
Adjustments to
Income Per
Income in Issue
Notices of
After
Item (Taxable Year 1976)
Deficiency
Respondent's
Concessions
A. 50 percent of the following expenditures:
1. Rent for house at 1017 N.W. 9th Ct.
$     5,700
$ -0-   2. Rent for South Florida Auto Auction
4,333
4,333 3. Ransom for release of Platshorn
300,000
50,000 4. Marijuana purchase in October
87,500
-0-   5. Marijuana purchase in November
105,000
-0-   6. Marijuana purchase in December
525,000
-0-   Total of Itemized Expenditures
$ 1,027,533
$ 54,333 Percentage Allocated to Platshorn
.50
.50 Total Allocated to Platshorn
$   513,767
$ 27,167 B. Personal living expenses
14,406
14,406 C. 1976 estimated income tax payment
1,185
1,185 Total Gross Income for 1976
$  529,358
$ 42,758 Less: Income Per 1976 Return
46,172
46,172 Total Adjustments for 1976
$   483,186
$ (3,414)
*742 Docket No. 26213-81 -- Robert Platshorn: Remaining
Adjustments to
Adjustments to
Income Per
Income in Issue
Notices of
After
Item (Taxable Year 1977)
Deficiency
Respondent's
Concessions
A. 50 percent of the following expenditures:
1. Rent for house at 1017 N.W. 9th Ct.
$     5,700
$     -0-  2. Rent for house at 320 W. San Marino
6,000
4,000
3. Purchase of the vessel Presidential
223,000
223,000
4. Purchase of the vessel Big Glo
280,000
150,000
5. Purchase of the vessel Two Bears
18,500
-0-  6. Purchase of the vessel Pacifier
-0-  135,000
7. Payment made to Bailey
10,000
-0-  8. Payment made to Purvis
10,000
-0-  9. Payment made to Smith
4,000
-0-  10. Lease deposit for restaurant in
North Carolina
500
-0-  11. Room charges and dock payments to
Fontainebleau Hotel
40,000
40,000
12. Marijuana purchase in April
560,000
-0-  13. Marijuana purchase in June
700,000
-0-  14. Marijuana purchase in August
1,085,000
-0-  15. Marijuana purchase in September
1,085,000
333,333
16. Marijuana purchase in December
793,450
339,000
17. Purchase of equipment by Purvis
on August 17, 1977
20,000
20,000
Total of Itemized Expenditures
$ 4,841,150
$ 1,244,333
Percentage Allocated to Platshorn
.50
.50
Total Allocated to Platshorn
$ 2,420,575
$ 622,167
B. Purchase of house at 5745 Pine Tree Drive
275,000
275,000
C. Purchase of Lincoln Continental
12,575
-0-  D. Christmas party
1,600
1,600
E. Income tax payment with 1976 return
1,529
1,529
F. Personal living expenses
15,065
15,065
G. Purchase of stock per return
13,575
13,575
Total Gross Income for 1977
$ 2,739,919
$   928,936
Less: Income Per 1977 Return
193,945
193,945
Total Adjustments for 1977
$ 2,545,974
$   734,991
*743 Docket No. 29798-82 -- Robert Platshorn: [1]
Remaining
Adjustments to
Adjustments to
Income Per
Income in
Issue
Notices of
After
Item (Taxable Year 1978)
Deficiency
Respondent's
Concessions
A. 50 percent of the following expenditures:
1. Purchase of Viking airplane
$  14,000
$ 14,000
2. Purchase of Martin 202
45,000
45,000
airplane/fuel truck
3. Purchase of Lear jet
250,000
-0-  4. Purchase of the vessel Pacifier [2]
135,000
-0-  5. Purchase of motorcycle in January
1,500
-0-  6. Purchase of motorcycle in February
5,000
-0-  7. Payment made to Smith
13,000
-0-  8. Payment made to Purvis
18,000
18,000
Total of Itemized Expenditures
$ 481,500
$ 77,000
Percentage Allocated to Platshorn
.50
.50
Total Allocated to Platshorn
$ 240,750
$ 38,500 B. Personal living expenses
16,509
16,509 C. Income tax payment with 1977 return
21,382
21,382
Total Gross Income for 1978
$ 278,641
$ 78,391
*744 Docket No. 26644-81 -- Robert Meinster: Remaining
Adjustments to
Adjustments to
Income Per
Income in Issue
Notices of
After
Item (Taxable Year 1976)
Deficiency
Respondent's
Concessions
A. 50 percent of the following expenditures:
1. Rent for house at 1017 N.W. 9th Ct.
$     5,700
$   -0-  2. Rent for South Florida Auto Auction
4,333
4,333
3. Ransom for release of Platshorn
300,000
50,000
4. Marijuana purchase in October
87,500
-0-
5. Marijuana purchase in November
105,000
-0-
6. Marijuana purchase in December
525,000
-0-
Total of Itemized Expenditures
$ 1,027,533
54,333
Percentage Allocated to Meinster
.50
.50
Total Allocated to Meinster
$   513,767
$  27,167
B. Personal living expenses
20,878
20,478
C. 1976 estimated income tax payment
4,200
4,200
D. Expenditures per return
-0-
115,095
Total Gross Income for 1976
$   538,845
$ 166,940
Less: Income Per 1976 Return
141,732
143,066
Total Adjustments for 1976
$   397,113
$  23,874
Docket No. 26644-81 -- Robert Meinster: Remaining
Adjustments to
Adjustments to
Income Per
Income in Issue
Notices of
After
Item (Taxable Year 1977)
Deficiency
Respondent's
Concessions
A. 50 percent of the following expenditures:
1. Rent for house at 1017 N.W. 9th Ct.
$     5,700
$     -0-  2. Rent for house at 320 W. San Marino
6,000
4,000
3. Purchase of the vessel Presidential
223,000
223,000
4. Purchase of the vessel Big Glo
280,000
150,000
5. Purchase of the vessel Two Bears
18,500
-0-  6. Purchase of the vessel Pacifier
-0-  135,000
7. Payment made to Bailey
10,000
-0-  8. Payment made to Purvis
10,000
-0-  9. Payment made to Smith
4,000
-0-  10. Lease deposit for restaurant in
North Carolina
500
-0-  11. Room charges and dock payments to
Fontainebleau Hotel
40,000
40,000
12. Marijuana purchase in April
560,000
-0-  13. Marijuana purchase in June
700,000
-0-  14. Marijuana purchase in August
1,085,000
-0-  15. Marijuana purchase in September
1,085,000
333,333
16. Marijuana purchase in December
793,450
339,000
17. Purchase of equipment by Purvis
on August 17, 1977
20,000
20,000
Total of Itemized Expenditures
$ 4,841,150
$ 1,244,333
Percentage Allocated to Meinster
.50
.50
Total Allocated to Meinster
$ 2,420,575
$   622,167
B. Purchase of house at 1444 W. 28th Street
$    48,422
$     -0-  C. New Year's Eve party
10,000
10,000
D. Income tax payment with 1976 return
190
190
E. Personal living expenses
21,832
21,832
F. Purchase of stock per return
6,000
6,000
G. Expenditures per return
-0-  140,481
Total Gross Income for 1977
$ 2,507,019
$   800,670
Less: Income Per 1977 Return [1]
230,653
233,897
Total Adjustments for 1977
$ 2,276,366
$   566,773
*745 Petitioners agreed by stipulation to the amount of their living expenses and their estimated income tax payments. Platshorn's personal living expenses were at least $ 14,406 for 1976, $ 15,065 for 1977, and $ 16,509 for 1978. Meinster's personal living expenses were at least $ 20,878 for 1976 and $ 21,832 for 1977. In 1976, Platshorn made estimated income tax payments of $ 1,185 and Meinster made estimated tax payments of $ 4,200. Platshorn paid income taxes in the amounts of $ 1,529 in 1977 and $ 21,382 in 1978. Meinster paid income taxes of $ 190 in 1977. In addition, Platshorn reported on his 1977 tax return a purchase of stock for $ 13,575. Meinster made additional expenditures as reported on his 1976 income tax return in the amount of $ 115,095, and additional expenditures for 1977 in the amount of $ 140,481. Meinster reported a $ 6,000 purchase of stock for 1977. At trial, petitioners did not address these stock purchases *746 and additional expenditures, and they are deemed to be conceded. FINDINGS OF FACT Platshorn was incarcerated in the United States Penitentiary at Marion, Illinois, at the time he filed his petitions. Meinster was incarcerated in the United States Penitentiary at Terre Haute, Indiana, at the time he filed his petitions. Pursuant to section 7482(b)(2), the parties have stipulated that the venue for purposes of an appeal in these cases is to be the United States Court of Appeals for the Eleventh Circuit. Petitioners were members of a marijuana smuggling organization known as the Black Tuna enterprise. Platshorn and Meinster were among 12 criminal defendants who were charged in a superseding indictment that covered a period from August 1974 to April 1978 and contained 36 counts. After a lengthy jury trial, petitioners were convicted in the United States District Court for the Southern District of Florida of conducting a continuing criminal enterprise involving an attempt to import 49,824 pounds of marijuana and other related Federal drug violations. United States v. Phillips, 664 F.2d 971 (5th Cir. 1981). Further, petitioners were convicted by the *747 United States District Court for the Eastern District of North Carolina of aiding and abetting the importation of 22,600 pounds of marijuana. United States v. Meinster, 619 F.2d 1041 (4th Cir. 1980). During the period covered by the indictment, petitioners brokered and imported marijuana "on a massive scale." United States v. Phillips, supra at 985. Platshorn received an aggregate sentence of imprisonment for 64 years and fines of $ 325,000. Meinster received an aggregate sentence of imprisonment for 53 years and fines of $ 270,000. Petitioners have known each other since the late 1940's, when they grew up as childhood friends in Philadelphia, Pennsylvania. After graduating from high school in the early 1960's, both Platshorn and Meinster initially attended Temple University, but later transferred to different colleges. Neither petitioner graduated; instead both dropped out to pursue separate business interests. Meinster worked in Philadelphia selling automobiles for his uncle and for various auto agencies. He then worked at his parents' dress shops. Platshorn worked at various concessions as a "pitchman" *748 selling ice cream and Vita-Mix blenders in Philadelphia. A "pitchman" sells items by means of a theatrical presentation. Eventually, Platshorn grew tired of working long days in his "nickel and dime" food and ice-cream concession business in Philadelphia and moved to Miami, Florida, at the end of 1975. Once in Miami, he initially reestablished himself as a "pitchman" selling small home appliances on a concession basis, mostly in Sears department stores. On May 5, 1976, Platshorn leased 5 acres of land located at 2999 N.W. 36th Street in Miami, on which he and Meinster planned to operate the South Florida Auto Auction (SFAA), the only used-car auction for car dealers in South Florida. Under the terms of the lease, rent for the premises was $ 2,083.33 per month, plus Florida sales tax. Platshorn paid $ 4,333.32 for the first and last month's rent, including taxes, at the time the lease was signed. A short time later, Meinster moved from Philadelphia to Miami to become Platshorn's business partner. Petitioners were partners from the middle of 1976 until their arrests in 1978. With the exception of the Presidential incident described below, in which Eugene Myers had a one-third *749 interest, Platshorn and Meinster shared equally in the expenses and in the profits from their marijuana importation business and the auto auction. SFAA was incorporated in July 1976. Platshorn and Meinster each contributed to the capital of the business. Though the auction was a promising venture, the business suffered a serious setback at the very first auction on July 8, 1976, when the manager announced that drafts, the normal means of payment in the business, would not be accepted. The business never recovered from the incident, and eventually SFAA became an "iron" auction dealing in wrecked cars. It was in the course of the business of SFAA that petitioners met Eugene Myers (Myers). Myers was in the wholesale seafood business, but also helped to obtain cars for SFAA. Sometime at the end of 1976, Platshorn took over the barbershop concession at the prestigious and luxurious Fontainebleau Hotel on Miami Beach. Despite the location, the shop did a poor business. The barbershop generated between $ 250 and $ 300 per week in income, and that income was reported on the barber's individual income tax return for 1977. However, on his Schedule C for 1977, Platshorn reported gross *750 receipts in the amount of $ 158,097. Platshorn could not recall how he arrived at the cost of goods sold of $ 74,562, as reported on the return, nor does he recall any specific details pertaining to the business, including the name of the business or the cost of a haircut. He did admit to recognizing income from his purported yacht charter business as income of the barbershop. On February 19, 1976, both Platshorn and Meinster were issued U.S. passports. On that same date, Platshorn flew to Bogota, Colombia, where he met Raul Davila (Davila), a successful businessman and a major export supplier of marijuana to what became petitioners' smuggling business. This first meeting took place in the Garden of Buddha, a house of prostitution. Platshorn's passport shows that between February 1976 and November 1977, he made at least 10 additional trips to South America, mainly to Colombia. The pages from Meinster's passport which would have recorded legal entry into foreign countries were deliberately removed. Meinster claimed that his 4-year-old daughter cut the pages from the passport while learning how to use a pair of scissors. Sometime late in 1976, Platshorn copiloted a small plane *751 to Colombia to meet with Davila. After Platshorn landed at a secluded airstrip, Colombian military authorities appeared and detained him. Davila negotiated and paid a ransom of approximately $ 50,000 to secure the release of both Platshorn and the plane, as well as to secure future landing rights. Within a short time after their arrival in Miami, Platshorn and Meinster acquainted themselves and associated with individuals of dubious reputation. Such associations included not only Davila, but also Myers, who acted as a middleman in various marijuana deals, as well as Cuban drug traffickers, among them Bobby Caldivillo, Tony Fernandez, and Rafael Sanchez. Petitioners also had very close associations with Mark Phillips (Phillips), who was part owner of Striker Aluminum Yachts, a large boat yard in Fort Lauderdale, and who catered to drug smugglers by raising the water line markings on vessels to give the appearance that they were floating normally when, in fact, they were loaded with marijuana. In addition, Phillips would strip the inside of boats to increase their capacity for loading marijuana. He had a substantial involvement in petitioners' organization. He was convicted *752 in absentia as a codefendant on the same charges as petitioners and is now a fugitive from justice. United States v. Phillips, 664 F.2d at 971. Petitioners also made the acquaintance of Henry Kluger, a high-volume marijuana trafficker from New York, who was later brutally murdered in the FloridaEverglades. He was involved with petitioners' organization either as a middleman or as a buyer of marijuana for the New York area. Petitioners freely admit to buying and selling marijuana as wholesalers during 1976 and 1977. The headquarters for petitioners' drug importation operation was located at the Fontainebleau Hotel (the Hotel), the same hotel where Platshorn maintained his barbershop concession. Petitioners leased the luxurious 17th-floor oceanfront Presidential Suites during the period of 1976 to 1978. The purposes of the Hotel suites were to provide a place for payments of money, to host elaborate parties for petitioners and their friends at which drugs were freely available, and to create the aura of petitioners' wealth and importance. Petitioners selected the Hotel in part because it offered a marina across the street that would accommodate *753 large yachts. Further, the Hotel was the most prestigious in Miami Beach, and petitioners hoped that this factor would help to establish their credibility in the drug trade. The Presidential Suites consisted of two levels, an upstairs with bedrooms, as well as an area for reading, and another area containing a piano. The lower level consisted of a general living area with a dining room, a room containing a pool table, and a separate kitchen. The Presidential Suites were the most expensive suites at the Hotel, and the rates charged ranged from complimentary to the full rate of $ 1,000 per night. The accountant for petitioners' drug operation, Howard Blumin (Blumin), performed nearly all of his work in the Hotel suites. He worked for petitioners from September 1976 until the middle of 1977. Blumin maintained precise accounting records of petitioners' drug dealings relating to three loads of marijuana that petitioners brokered during late 1976 and early 1977. Since petitioners were wholesalers who bought and sold marijuana on a consignment basis and kept inventory in their business, Blumin maintained their books and records on the accrual basis. Blumin kept track of the weight *754 of each load of marijuana, the amount of moneys due and payable to petitioners' suppliers, and the amount of moneys due and receivable from their buyers. He used code names given to him by petitioners to identify the suppliers and buyers of marijuana, whose identities remained unknown to him. At periodic intervals, petitioners asked Blumin for a list of code names and balances due the organization. The records kept by Blumin were seized in the course of the criminal investigation and are no longer available. The moneys that were payable to petitioners were handled by Blumin and Myers at the Hotel. Myers assisted petitioners in several of their drug transactions by serving as a middleman. Myers' principal function as a middleman was to collect the debts of customers of petitioners' marijuana business and deliver or arrange for delivery of the moneys to Blumin. Blumin recalls one occasion in which a suitcase containing approximately $ 70,000 was delivered to the Presidential Suites by John Sadowski, a principal customer of petitioners. The money was then counted by both Blumin and Myers. The three loads of marijuana accounted for by Blumin were purchased and sold on consignment. *755 Petitioners made an initial payment to their suppliers and paid the balance of the purchase price with the proceeds from their resales of marijuana. Similarly, petitioners' buyers made an initial payment to petitioners and paid the balance of the purchase price with the proceeds from their sales further down the distribution line. Petitioners could not have walked away from their suppliers without having paid the outstanding balance on the marijuana which was partly purchased on credit. Petitioners had to make timely payments to their suppliers; otherwise they would have jeopardized their ability to receive future supplies of marijuana for resale. During the period when Blumin kept the accounting records for petitioners, he was instructed to keep their moneys in a safe-deposit box in City National Bank (the Bank) in Miami. Blumin kept large amounts of petitioners' cash in the largest safe-deposit box available at the Bank, the dimensions of which were approximately 1 foot by 1 foot by 1 1/2-2 feet. Petitioners' moneys were kept in the box from January 17, 1977, until no later than November 27, 1978, when Blumin's wife was added as a signatory to the box. Blumin estimated that *756 between $ 500,000 and $ 700,000 was the greatest amount that was ever kept in the safe-deposit box at one time. Blumin also kept approximately $ 2,000 at his home for petitioners. Blumin deposited and withdrew money from petitioners' safe-deposit box exclusively on their instructions. Either envelopes or bags containing cash were deposited into the box by Blumin. There was never any regular amount that was deposited. The phrase "burying bones" was the code phrase between Blumin and petitioners signifying that Blumin was to place cash in the safe-deposit box. In addition to his duties as accountant, Blumin was responsible for making cash deposits into the bank accounts of various code-named individuals. These were not petitioners' accounts. Blumin acted solely on petitioners' instructions regarding these deposits, and he received the moneys for deposit from petitioners. On one occasion in 1977, petitioners gave Blumin either two large suitcases or bags containing cash to deposit in a code-named account at a branch office of the Flagship Bank in Miami Beach. Blumin used the name "Mr. Roberts" when he presented himself to bank officials, apparently because both petitioners *757 were named Robert. Blumin does not recall the code name of the account to which the deposit was made or the exact amount actually deposited. Blumin never knew the exact amount being deposited into these accounts, and he never received the deposit slips for the transactions. The deposit slips were returned from the various banks directly to petitioners by way of other couriers. Further, petitioners would instruct Blumin to make cash payments to associates of the organization. Acting on petitioners' instructions in 1977, Blumin met Phillips in an upstairs room of Blumin's Miami paint and hardware store and gave Phillips approximately $ 285,000 for the purchase of a boat. Petitioners utilized the services of Larry Richter (Richter), a real estate agent. In addition to assisting petitioners in obtaining real estate for living purposes, Richter procured "stash houses", i.e., houses used to warehouse petitioners' marijuana inventory. Petitioners paid Richter additional commissions for locating these stash houses. On February 23, 1977, Richter leased a warehouse off the Palmetto Expressway, a primary artery to other major roads and highways in Miami. Platshorn told Richter that *758 the warehouse would be used to store marijuana. The warehouse was leased in the name of Cine-Tech Films, Inc., a fictitious entity. Petitioners also had trucks which they used to offload marijuana which bore magnetic signs reading Cine-Tech Films, Inc. Petitioners also asked Richter to locate a house with access to the deep sea where people could come and go without being easily seen and which would include garage facilities to accommodate a van. Petitioners told Richter that the purpose of the house was to offload and warehouse marijuana. Richter found a house located at 320 W. San Marino Island, Miami Beach, that met petitioners' specifications. Meinster inspected the house before the lease was signed and was introduced to the owner of the house as Dr. Lyle Roberts. Richter paid $ 4,000 on behalf of petitioners when the lease was signed on February 21, 1977. This amount included a $ 500 deposit, plus $ 1,500 additional rent for the first month, plus $ 2,000 as a security deposit. The lease period was for 3 months, beginning February 21, 1977, and ending May 21, 1977. Richter himself signed the lease as Dr. Lyle Roberts. On April 27, 1977, the Miami Beach police raided *759 the San Marino Island house and seized 16,000 pounds of marijuana. Sandra Ginsburg (Ginsburg), an assistant to the credit manager of the Hotel for the years 1976 and 1977, was in charge of the Platshorn and Meinster accounts. Petitioners paid all of their bills at the Hotel in cash. On cash accounts, Ginsburg was responsible for collecting the bill every 10 days or when account balances reached a level between $ 2,000 and $ 5,000, including any room service charges. Platshorn and Meinster received a special discount rate on accommodations as a result of the influence of Ahmad Boob, owner of Boob's Steak House and a close associate of the owner of the Hotel, Ben Novak. However, the exact discount rate that petitioners received at the Hotel is unknown. During their occupation of the Presidential Suites, petitioners frequently requested copies of their charges for the suites. On one occasion in 1976 or 1977, petitioners asked Ginsburg to come to their suites to collect cash to pay their bill. Upon arrival at petitioners' suites, Ginsburg was told to count and take the amount of cash that was needed for their bill from a briefcase full of cash. The amount of money collected on *760 this occasion was more than the salary that Ginsburg earned at the Hotel in a year. Ginsburg's yearly compensation while employed at the Hotel was between $ 5,000 and $ 7,000. In addition to the Presidential Suites, petitioners leased, between the end of 1976 and the middle of 1977, approximately five dock slips belonging to the Hotel and located at a marina on a waterway across the street. Petitioners paid $ 150 per dock per month, a payment which included electricity and telephone service to the Hotel, for the purpose of docking luxury yachts and other large vessels which were used in their drug operation. Petitioners used the luxury yachts to smuggle marijuana because they drew less attention than commercial vessels. The names of the vessels that petitioners docked at the marina included Nature's Way, Big Glo, Pacifier, Miss Dorothy, Presidential, and a houseboat, Beam's Post Time. All of the vessels except the Presidential were registered in the name of Mark Phillips. Platshorn explained that the use of the boat slips and various yachts docked at the Hotel marina was for the operation of a yacht charter and sales business. However, no such business *761 ever existed. Leonard Bierman (Bierman) operated Bierman Boat Sales, a business which purchased, refitted, and resold used boats. In 1976, Bierman purchased the Pacifier, a 42-foot Rybovich powerboat custom built in West Palm Beach, Florida. Bierman received a telephone call from Phillips on the evening of April 28, 1977. Phillips, acting on petitioners' behalf, negotiated the $ 135,000 purchase price for the boat. Phillips met Bierman at a bank the next day and paid for the boat in cash, which he carried in a briefcase. On the evening of April 29, 1977, Bierman met Meinster on the Pacifier, and Meinster identified himself as its purchaser. The Presidential was a luxury cruising yacht approximately 85-90 feet in length. This yacht was formerly named Naughty Girl, but it was renamed Presidential, apparently in reference to petitioners' use of the Presidential Suites as a place of business. The Presidential was registered in North Carolina under the fictitious name of Roger Culpepper. The Big Glo was a 44-foot, diesel-powered Striker sport fishing boat. Sometime in 1977, Bierman observed the Big Glo docked at a boat slip at the Hotel marina *762 and became interested in purchasing it. At that time, Bierman asked Randy Fisher (Fisher), a person on board the Big Glo, if the boat was for sale. Bierman was told to speak with the owners, who were on board the yacht Presidential. Bierman was willing to purchase the Big Glo for approximately $ 150,000. Bierman was introduced to petitioners by Fisher, and petitioners informed Bierman that the Big Glo was not for sale at any price at that time. Petitioners never disavowed ownership of the Big Glo. Platshorn admitted to using the yacht Big Glo in sport fishing tournaments. In September 1977, the yacht Presidential, loaded with marijuana and bound for the coast of North Carolina, began taking on water near the Bahamas. Meinster instructed George Purvis (Purvis), an associate of petitioners' drug business, to take Nature's Way to rescue the endangered cargo, but Purvis never, in fact, made this trip. Big Glo was then sent to attempt the rescue of the cargo; Fisher, a crew member, was fired on by the Bahamian police and retreated before he could reach the Presidential. Before the rescue could be effected, the ship and cargo were seized *763 by the Bahamian police. The cargo weighed 32,824 pounds. Hereinafter, this episode will be referred to as the Presidential incident. As previously stated, Myers and petitioners each had a one-third interest in this venture. In late September after the Presidential incident, petitioners devised another plan to import marijuana into North Carolina in October. There were several delays in this plan, and it was not executed until December 1977. The plan was to use the ship Osprey to rendezvous with Davila's supply ship or mother ship, the Don Elias, off the North Carolina coast. A member of the crew on board the Osprey, Wade Bailey, was an informant for the United States Customs Service. Purvis, who was from North Carolina, located the spot where the marijuana was to be offloaded and was on board the ship Two Bears during this episode. Hereinafter this episode will be referred to as the Osprey incident. At the time of the rendezvous, the password "Black Tuna" was used to make and confirm contact with the mother ship. After the rendezvous with the mother ship, Purvis proceeded to the offloading site. His role was to monitor the radio for police traffic *764 and to oversee the offloading of the marijuana. Meinster was located near the offloading site in a communications van. Normally, Platshorn oversaw the offloading operations of the business, but, as a result of the Presidential incident, he felt he was under surveillance and so he made a trip to Mexico in hopes of diverting the attention of the authorities. Before the Osprey landed, the authorities intercepted the load. Purvis escaped and later surrendered to the police. The parties have stipulated that the amount of marijuana seized by the Drug Enforcement Administration and United States Customs Service from the Osprey was 22,600 pounds. In addition to the purchase of various yachts used in their smuggling business, petitioners purchased aircraft, trucks, and other equipment. In August 1977, Platshorn gave Purvis $ 20,000 in a blue bank bag for the purchase of trucks and equipment to be used in the Osprey incident. In 1978, Platshorn purchased in Chicago, Illinois, a Viking Belanca single-engine airplane for $ 14,000. In that same year, Platshorn also purchased a Martin 202 airplane for $ 40,000 and a used fuel truck for $ 5,000. Both of the airplanes, the *765 three trucks, and equipment were all used in petitioners' organization in abortive attempts to smuggle marijuana from South America into the United States. In one of these attempts in 1978, Purvis crash-landed the Martin 202 in Colombia and the plane was lost. During the taxable years in issue, petitioners, in addition to smuggling marijuana, also had a pattern of using drugs for their own recreation. These drugs included both marijuana and cocaine. Petitioners used the code name "souvenirs" when making reference to cocaine. Although petitioners were not heavy users of drugs, they were daily users. Meinster was known to use an extra long fingernail that he had grown to scoop up his "souvenirs". Other members of the Black Tuna organization also consumed drugs, and some of them consumed drugs heavily. Much of the recreational drug use occurred in the Presidential Suites, where petitioners would throw large parties for members of their organization and other business associates and would provide drugs and liquor for the guests' consumption. Additional drug use occurred when petitioners entertained friends and business associates in their homes. During 1977, Platshorn gave a *766 Christmas party at his Pine Tree Drive residence, where he served drugs and liquor to his guests. In that same year, Meinster hosted a large New Year's Eve party with approximately 30 guests. Large quantities of expensive food, liquor, and drugs were made available for his guests' consumption. Petitioners would pay for their drugs and other purchases in cash and were free spenders. Platshorn would carry a purse, 9 by 6 inches in size, which contained large sums of cash. On one occasion, Platshorn withdrew $ 2,000 from his purse and gave it to Richter to purchase a quarter ounce of cocaine for Platshorn's personal use. In addition, Platshorn would leave restaurant tips six times as large as the bill. There was one instance where Purvis' and Platshorn's meal at a Cuban restaurant totaled $ 3 for both of them. Platshorn paid the bill and left a $ 20 tip. Meinster would provide cash loans to associates of the organization, including Purvis, Richter, and Myers, whenever they needed money. It was not uncommon for Platshorn to loan $ 500 on the spur of the moment to Richter. In addition to paying cash for the services rendered by associates of the smuggling organization, petitioners *767 would offer cocaine in lieu of cash payment. OPINION In general, respondent's determinations are presumed to be correct, and petitioners have the burden of proof to show that they are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent, however, has the burden of showing the correctness of increases in deficiencies asserted in the answer. Rule 142(a). As a preliminary matter, we consider the issue of petitioners' invocation of the Fifth Amendment privilege against self-incrimination. Other than petitioners' blanket admission to buying and selling marijuana in 1976 and 1977, petitioners declined to answer the majority of questions posed concerning their dealings in marijuana or their income therefrom, invoking the Fifth Amendment. They did testify, however, concerning certain of the proposed expenditures which respondent determined represented unreported income. As this is a civil proceeding, we may draw a negative inference from a party's refusal to testify, provided that there is some independent evidence in addition to the mere invocation of the privilege, upon which to base the negative inference. Baxter v. Palmigiano, 425 U.S. 308 (1976); *768 United States v. Local 560, Internatl. Brotherhood of Teamsters, 780 F.2d 267, 292-293 n.32 (3d Cir. 1985). Even without the Court's drawing a permissible negative inference concerning petitioners' refusal to testify, it is clear that petitioners have seriously impaired their ability to carry their burden of proof in this case. Petzoldt v. Commissioner, 92 T.C. 661, 685-686 (1989). This refusal to testify is all the more damaging in view of the absence of books and records and in view of petitioners' practice of doing business in cash in order to conceal the extent of their income and the nature of their clandestine business. Taxpayers are required to retain sufficient records from which their true income can be determined. Sec. 6001. Where their records are incomplete or inaccurate, the Commissioner is authorized to reconstruct their income in accordance with any reasonable method that accurately reflects actual income. Secs. 446(b), 6001; Petzoldt v. Commissioner, supra at 687; Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965). Respondent has great *769 latitude in reconstructing income and may employ any of a wide selection of methods to do so. Taglianetti v. United States, 398 F.2d 558, 562 (1st Cir. 1968), affd. on other grounds 394 U.S. 316 (1969); Ramsey v. Commissioner, T.C. Memo. 1980-59; Bolton v. Commissioner, T.C. Memo. 1975-373. The reconstruction need only be reasonable in light of all surrounding facts and circumstances. Breland v. United States, 323 F.2d 492, 496 (5th Cir. 1963); Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). Because petitioners had no books and records, respondent used the source and application of funds method, often termed the cash expenditures method, of reconstructing their income. As a rule, the computation is made by using the method of accounting regularly employed by the taxpayer. Petzoldt v. Commissioner, supra at 693. While Blumin testified that he maintained books and records on the accrual *770 method for three loads of marijuana imported by petitioners, petitioners were by no means accrual method taxpayers. In any event, the expenditures method of income reconstruction, as used in this case, is not a method of accounting different from the one employed by petitioners. Holland v. United States, 348 U.S. 121, 131 (1954). Whatever petitioners' accounting method, it clearly was not designed to accurately reflect their income. If the taxpayers' accounting method does not reflect their income, "the computation of taxable income shall be made under such method as, in the opinion of the * * * [Commissioner], does clearly reflect income." Sec. 446(b); sec. 1.446-1(b)(1), Income Tax Regs. The United States Court of Appeals for the Eleventh Circuit, to which an appeal in this case would lie, has approved the use of indirect methods of establishing income in comparable cases. [1]United States v. Scrima, 819 F.2d 996 (11th Cir. 1987); United States v. Carter, 721 F.2d 1514 (11th Cir. 1984); Carson v. United States, 560 F.2d 693 (5th Cir. 1977); Marcello v. Commissioner, 380 F.2d 494 (5th Cir. 1967), *771 affg. in part and remanding T.C. Memo. 1964-302; Price v. United States, 335 F.2d 671 (5th Cir. 1964); Merritt v. Commissioner, 301 F.2d 484 (5th Cir. 1962), affg. T.C. Memo. 1959-172. The Supreme Court has sanctioned the cash expenditures method of reconstructing income in United States v. Johnson, 319 U.S. 503, 517-518 (1943), stating that to require meticulous proof of the amounts of income received "from an elaborately concealed illegal business, would be tantamount to holding that skillful concealment is an invincible barrier to proof." Reconstruction of income by the *772 cash expenditures method is accomplished by comparing known cash expenditures with known receipts. If a taxpayer's expenditures for a given year exceed reported income and the source of the funds is unexplained, the excess expenditures represent unreported income. This method is a variant of the net worth method of establishing income. Both require the establishment of the taxpayer's net worth at the beginning of the period as a method of determining whether the increase in net worth or expenditures, or any portion thereof, is due to assets on hand. Taglianetti v. United States, supra at 562. The cash expenditures method is devised to reach a taxpayer who consumes his income rather than increasing his net worth. The income reconstruction is accomplished by establishing the amount of the taxpayer's purchases of goods and services which are not attributable to the resources at hand at the beginning of the year or to nontaxable receipts during the year. Id.
The Supreme Court has held that, in the use of these methods, two precautions must be observed: the Commissioner must, with reasonable certainty, establish an opening net worth, and net *773 worth increases must be attributable to taxable income. Holland v. United States, supra; Petzoldt v. Commissioner, 92 T.C. 661, 694 (1989). Increases in net worth, by themselves, cannot be assumed to be attributable to currently taxable income. However, in the typical cash expenditures case, unlike a net worth case, precise net worth figures are not required. "In a cash expenditures case reasonable certainty may be established without such a presentation, as long as the proof * * * makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures." Taglianetti v. United States, supra at 565. The essential question then becomes "whether any expenditures found to be in excess of reported income can be accounted for by assets available at the outset of the prosecution period or non-taxable receipts during the period." Id.
The rule followed by the Eleventh Circuit is that cash expenditures are assumed to be from taxable income. It is the burden of the taxpayer to demonstrate a nontaxable source of income. *774 Furthermore, rigorous proof of opening net worth at any time in cases where income is reconstructed by the cash expenditures method is not required. Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964)
Respondent determined that petitioners had made certain expenditures and, on the assumption that petitioners were equal partners, allocated 50 percent of each expenditure to the income of each petitioner for tax years 1976 and 1977. For 1978, only Platshorn received a notice of deficiency. For that year 50 percent of each determined expenditure was allocated to him as income. We find that, with the exception of the Presidential incident, petitioners were equal partners in their marijuana venture and the SFAA. They shared equally in the expenses and the profits. Unless otherwise noted, respondent determined that 50 percent of each of the following expenditures represented taxable income to each petitioner. I. Understatement of Income: Taxable Year 1976
A. Rent for SFAA
In May 1976, land was leased to operate the SFAA. Respondent determined that petitioners paid a total of $ 4,333.32, the amount of the first and last month's *775 rent including taxes, for the 5 acres of land on N.W. 36th Street in Miami, which were to be used for the SFAA. While the payment was made by Platshorn, respondent determined that, in view of petitioners' equal partnership, 50 percent of this expenditure constituted income to each petitioner. In the Amended Answer, respondent alleged that petitioners together made a capital contribution of $ 50,000 to the SFAA, but conceded this issue on brief. Petitioners claim that, in making these payments, Platshorn used funds from his Miami appliance business and his ice-cream business in Philadelphia and Meinster used cash on hand from his family's dress business in Philadelphia. The Court finds credible petitioners' assertions that the funds on hand from their respective prior businesses were the source of the initial rent payment for the SFAA. We find and hold that petitioners' initial rent payment in the amount of $ 4,333.32 was paid from funds which petitioners had on hand at the commencement of the year in question, taxable year 1976, and consequently did not represent income to them under the cash expenditures method of income reconstruction. B. Ransom for Release of Platshorn
*776 Late in 1976, Platshorn copiloted a small plane on a trip to Colombia to meet Davila, a primary export supplier of petitioners' marijuana. After Platshorn landed on a secluded airstrip, the Colombian military authorities appeared and detained him. Shortly thereafter Davila negotiated and paid a ransom of at least $ 50,000 to secure the release of Platshorn, the plane, and possibly other people, as well as to secure future landing rights. Respondent determined that the payment was made by petitioners and argues, in the alternative, that it constituted income to petitioners on a theory of economic benefit, citing Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929). Under the circumstances, we find it implausible that petitioners paid this amount from their own pockets. It seems more plausible, on the scanty sum of evidence presented, that the payment was made by Davila from his own funds and primarily for his own benefit. Davila exercised near-sovereign control over a small peninsula in Colombia and paid bribes to Colombian officials in order to perpetuate his fiefdom. We are certain that Davila made these payments primarily for his own benefit. *777 Furthermore, there is no standard to assist us in determining the amount of economic benefit derived from a bribe to a foreign official or the (undoubtedly great) benefit of release from imprisonment in Colombia. The payment was made in part to secure landing rights, an outcome which incidentally helped petitioners, but which was primarily for Davila's benefit as an exporter of marijuana. We find that petitioners were third-party beneficiaries of any relationship that Davila had established with the local authorities. We consequently hold that petitioners did not receive a quantifiable economic benefit as a result of Davila's paying a $ 50,000 bribe to Colombian officials in 1976 and that this payment did not represent income to them. II. Understatement of Income: Taxable Year 1977
A. Rent for House at 320 W. San Marino
On February 21, 1977, petitioners' real estate agent, Larry Richter (Richter), signed on their behalf a lease for the house at 320 W. San Marino Island in Miami, Florida. Meinster inspected the premises before the lease was signed to determine whether it satisfied his specifications for a stash house. During this inspection, Richter introduced *778 Meinster to the owner of the house as Dr. Lyle Roberts. Later that same day, Richter signed the lease as petitioners' agent, using the name Dr. Lyle Roberts, and paid rent of $ 4,000. Approximately 2 months later, on April 27, 1977, the Miami police raided the house and seized 16,000 pounds of marijuana. Respondent included the sum of $ 4,000 rent in the determination of petitioners' income for 1977. [2] We find and hold that this amount was spent in the course of petitioners' business and that 50 percent of it constituted income to each petitioner. B. Purchase of the Vessels Presidential, Big Glo, and Pacifier
Because of the nature of petitioners' business activities, we are compelled to rely on circumstantial evidence in determining the ownership of the yachts and *779 other vessels which they used. Title to the yachts was in the name of Mark Phillips, with the exception of the Presidential, which was registered in July 1977 in North Carolina under the name of Roger Culpepper. Platshorn testified that the Presidential was purchased by Mark Phillips and Mandy Jackson from the proceeds of sale of another boat to the smuggling organization of Donald Steinberg, which also used Striker yachts. Respondent determined in the notice of deficiency that the purchase of the Presidential for $ 223,000 represented income to petitioners in 1977 and that 50 percent of the purchase price of the vessel Pacifier, i.e., $ 135,000, represented income to Platshorn in 1978. In the Amended Answer, respondent alleged that the purchase of the yacht Pacifier represented income to petitioners in 1977, rather than 1978. The burden of proof on the issue of the Presidential rests with petitioners, and on the issue of the Pacifier, with respondent. On the evening of April 28, 1977, Bierman received a telephone call from Phillips regarding the vessel Pacifier. Phillips negotiated the purchase of the Pacifier from Bierman for $ 135,000. *780 The following day, the sale was consummated at a bank, when Phillips paid cash for the vessel. Phillips asked for immediate possession of the Pacifier and requested that Bierman remove his belongings by the end of the day. On that same evening, Meinster identified himself to Bierman as the new owner. Meinster denies purchasing any boats in 1977, but acknowledges picking up this boat on Phillips' behalf. On the basis of the entire record, we find that respondent has carried the burden of proof in establishing that petitioners were the actual owners of the Pacifier and that they purchased it in 1977 for $ 135,000. We are persuaded that the funds for the purchase of the Presidential came from the approximately $ 285,000 which Blumin vividly recalls giving to Phillips in an upstairs room of Blumin's Miami paint and hardware store. Petitioners not only told many people that the Presidential was their yacht, but they clearly demonstrated an exercise of dominion and control over it. There is no dispute that the Presidential was lost on one of petitioners' marijuana runs in 1977. The mere fact that this yacht was not registered in petitioners' names carries very *781 little weight in our decision; petitioners did business using the names of various individuals and entities in order to leave no record of their activities. On the other hand, we are heavily influenced by the fact that petitioners had sufficient authority over the Presidential to risk its loss. With regard to the yacht Big Glo, respondent determined in the notice of deficiency that petitioners expended $ 280,000 for its purchase in 1977. In the Amended Answer, respondent conceded that the purchase price of the Big Glo was $ 150,000. Petitioners offered no evidence as to the purchase price, but merely denied ownership. We are convinced that the Big Glo, a 44-foot Striker fishing vessel, was acquired by petitioners early in 1977, despite the fact that Platshorn maintained that it was owned by Striker Aluminum Yachts, Phillips' boat business. Bierman, who was the owner of Bierman Boat Sales, a large and respected boat dealer in Miami, offered to purchase the vessel for at least $ 150,000. Petitioners' only response to Bierman's offer to buy the Big Glo was that it was not for sale at any price. This response clearly indicates that petitioners were its owners *782 and that a knowledgeable buyer would have paid $ 150,000 for it. Petitioners asserted that they had a yacht charter business in order to explain the presence of the vessels at the Hotel and their involvement with the vessels. We have concluded that no such charter business ever existed. This finding is supported by the fact that several credible witnesses, including Bierman, Purvis, and Blumin, knew nothing about the existence of this business, and there are no records of such a business. For the reasons stated above, we sustain respondent's determination that petitioners had income in 1977 in the amounts of $ 233,000 and $ 150,000, representing the purchase price of the vessels Presidential and Big Glo. Furthermore, we find that respondent has carried the burden of proof in establishing that petitioners had income in 1977 in the amount of $ 135,000, representing the purchase price of the vessel Pacifier. C. Purchase of Equipment by Purvis
In August 1977, Platshorn gave Purvis $ 20,000 in a blue bank bag for the purchase of trucks to be used in the Osprey incident. With that money, Purvis purchased two trucks for $ 10,000, as well as other equipment to *783 be used in this venture, and gave $ 500 to Leroy Smith, a friend who was to help offload the marijuana. On the basis of Purvis' very credible testimony, which was uncontroverted, we uphold respondent's determination that $ 20,000 given to Purvis represented income to petitioners in 1977. D. Room Charges and Dock Payments to Fontainebleau Hotel
Respondent determined that in 1977 petitioners paid at least $ 40,000 for the use of the Presidential Suites as well as for rental of dock slips for their vessels. Petitioner Platshorn denies being a resident of the Hotel, says he never paid the full rate of $ 1,000 per day, and argues that, if we find he did pay room charges to the Hotel, he is entitled to a business expense deduction for the amount of the payment. He also directs our attention to the fact that the only substantiated payment to the Hotel was the payment of $ 5,000-$ 7,000 cash to Ginsburg. Meinster admits to frequenting the Hotel on a regular basis during the period in question. As stated above, meticulous proof of income reconstruction is not required in a case where taxpayers have created an elaborate scheme to conceal their income. United States v. Johnson, 319 U.S. 503, 517-518 (1943). *784 We have found that Blumin worked for petitioners in the Presidential Suites from September 1976, until approximately the middle of 1977, and that he did most of his work in the Hotel. Petitioners clearly used the Hotel as their headquarters for at least these 9 months. It is also clear that the $ 5,000-$ 7,000 payment for the room charges at the Hotel was for a relatively short period of time, probably no more than 10 days. Even if petitioners received a 75-percent discount off the $ 1,000 per night rate and occupied the Presidential Suites only 183 days per year, their bill would have totaled $ 45,750, exclusive of the cost of the dock space. Petitioners concede that they rented dock space for their vessels, approximately five slips at a cost of $ 150 per month per slip, or $ 9,000 per year. Petitioners have not carried their burden of proof in discrediting respondent's determination that they paid $ 40,000 in charges to the Hotel in 1977. Petitioners argue on brief that, if the Court finds respondent's determination on this issue to be correct, they are entitled to a business expense deduction for rental payments made to the Hotel. We have found that, in addition to using *785 the Presidential Hotel as a business headquarters, petitioners also used it and the yachts moored there for substantial personal purposes. The boat slips, for instance, represented, in part, a personal expense because of the considerable element of personal pleasure involved in petitioners' use of the yachts. Like so many of petitioners' expenses, the Hotel was in part a business expense and in part a component of their lifestyle. While it lies within the authority of the Court to estimate the amount of allowable deductions where there is evidence that deductible expenses were incurred, Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), we must have some basis on which an estimate may be made. Williams v. United States, 245 F.2d 559 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). As stated in Williams v. United States, supra at 560, Cohan requires that: there be sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose. Until the trier *786 has that assurance from the record, relief to the taxpayer would be unguided largesse. Petitioners have failed to bring forth any evidence which would enable us to make such an estimation. We hold for respondent on this issue. E. Marijuana Purchases in September and December
In September 1977, petitioners attempted to smuggle 32,824 pounds of marijuana into North Carolina on the yacht Presidential; both ship and cargo were lost when the yacht took on water in the Bahamas and was subsequently confiscated by Bahamian officials. The ship Osprey was confiscated in December of the same year by Federal agents as it was offloading its 22,600-pound cargo in North Carolina. Respondent initially determined that the value of the Presidential cargo was $ 1,085,000. On brief, respondent conceded that the purchase price for the load was $ 500,000. This calculation was based on the conservative assumption that the value of 1 pound of marijuana was $ 15.23 (rounded to $ 15). Given that Myers was responsible for one-third of that load, respondent determined that petitioners were responsible for $ 333,333, representing the wholesale purchase price of two-thirds of that load *787 of marijuana. In December 1977, the entire cargo of the fishing vessel Osprey was confiscated by Federal officials. Petitioners stipulated that the weight of the cargo was 22,600 pounds. Using the same value of $ 15 per pound, respondent determined that petitioners paid at least $ 339,000 to purchase the marijuana confiscated by the authorities from the vessel Osprey. Petitioners argue that they bought all their drugs on credit and that they never fully paid for their inventory, due to their heavy losses in 1977. Blumin testified that the three loads he accounted for in late 1976 and early 1977 were not fully paid for by September 1977. Blumin had severed his business relationship with petitioners by September 1977. There is no further corroborating testimony on this point. Petitioners freely admit to having dealt in marijuana as wholesalers, but refused to answer specific questions regarding their marijuana dealings. Consequently, they have done nothing to carry their burden of proof on this issue. We find that the amounts of marijuana in these loads were well established and that respondent's calculations are reasonable, indeed conservative. Petitioners argue, *788 in a general way on brief, that they are entitled to deductions "for the purpose of proper business expenses", directing our attention to Blumin's testimony. The deductions specifically mentioned by petitioners are the losses sustained as a result of the confiscation of their vessels and their marijuana and the loss of the Martin 202 airplane. These would be deductible, if at all, as losses under section 165(a) and (c)(1). A loss deduction, however, is not allowed if it would frustrate a sharply defined Federal or State policy. Fuller v. Commissioner, 213 F.2d 102 (10th Cir. 1954), affg. 20 T.C. 308 (1953). In Holt v. Commissioner, 69 T.C. 75 (1977), affd. per curiam without published opinion 611 F.2d 1160 (5th Cir. 1980), we denied a loss deduction to a marijuana dealer for the cost of a confiscated vehicle and marijuana on the basis of the sharply defined Federal policy against the sale of marijuana. We held that confiscated or forfeited property of a drug dealer gives rise to a loss rather than an ordinary and necessary business expense. Consequently, the ambit *789 of the loss denial is broad and would encompass all petitioners' business casualty losses, including the marijuana and vessels seized and the loss of the Martin 202 airplane in Colombia. Furthermore, petitioners have not met their burden of proof as to the amounts of their losses, relying only upon Blumin's testimony concerning their failure to show a profit on the three loads of marijuana for which he accounted. Respondent's determinations are sustained on the issues of petitioners' two purchases of marijuana in September and December 1977. F. Platshorn's Purchase of the House at 5745 Pine Tree Drive On June 24, 1977, Lynne and Robert Platshorn purchased the property at 5745 Pine Tree Drive in Miami Beach, Florida, for $ 275,000 cash. Platshorn claims to have financed the initial purchase price of the house through "family" loans. On July 24, 1978, Platshorn subdivided the property and sold a subdivided lot to a Venezuelan general for $ 75,000. Platshorn claims to have financed the balance of the purchase price through an unrecorded mortgage which he gave to a man whose name he did not remember, but who had been "floorplanning" [3] cars for the SFAA. There were no mortgages *790 recorded against the house in connection with this transaction. Respondent determined that the amount of $ 275,000 represents income to Platshorn. We sustain respondent's determination. The record is clear that Platshorn engaged in cash transactions and provided only flimsy explanations. We are not bound to accept his self-serving testimony in the absence of corroborating evidence. Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). Thus we find that the purchase of the Pine Tree Drive residence for cash is evidence sufficient to establish that the same amount was income to Platshorn in the year in question. G. Platshorn's Christmas Party
In December 1977, Platshorn hosted a Christmas party at his Pine Tree Drive residence. Available for consumption at this party were Tai sticks, a very potent type of *791 marijuana cigarette, along with cocaine, which was freely available to the guests. Platshorn concedes that he held a party at this time, but disputes the amount of respondent's determination of $ 1,600 as the cost of the party. On the basis of the record, we find that Platshorn has not carried his burden of proof on this issue, and we uphold respondent's determination. H. Meinster's New Year's Eve Party
On New Year's Eve 1977, Meinster hosted a party at his residence with approximately 30 guests, including Platshorn and his wife, Blumin, Phillips, Mandy Jackson, and other associates of the Black Tuna organization. Gold Black Tuna medallions were given out to associates who had successfully completed an importation of marijuana. Guests contributed $ 100-$ 200 each. Large quantities of liquor and expensive food such as stone crab were provided, and cocaine was freely available in open saucers throughout the house. In addition to the approximately one-fourth pound of cocaine supplied by the guests, Meinster also supplied one-fourth pound of cocaine. No persuasive evidence was introduced, however, as to the market value of this cocaine or any of the other expenditures for *792 this party. Respondent determined that the cost of the party was $ 10,000. In view of independent testimony that guests contributed substantial sums of money toward the expenses, we find that Meinster expended no more than $ 5,000 for this party. We therefore hold that the expenses of the 1977 New Year's Eve party represented income to Meinster in the amount of $ 5,000. III. Understatement of Income: Taxable Year 1978 -- Platshorn
A. Purchase of Viking and Martin 202 Airplanes and Fuel Truck
Respondent determined that a Viking Belanca single-engine airplane was purchased by Platshorn in Chicago, Illinois, for $ 14,000 and was flown to Paris, Texas. Platshorn testified that the aircraft belonged to the airplane dealer, the Reverend Isaac Newton Burchinal (Burchinal), a Baptist minister who operated an air museum and sold old military and commercial aircraft. Platshorn further testified that he was in Paris, Texas, in order to learn to fly open cockpit tail-dragger airplanes. In view of the fact that petitioners had a pattern of maintaining ownership and establishing title to their boats and other vehicles in the names of third parties, we are not convinced by this *793 explanation. We believe that only an owner who expected gains of great magnitude would take a risk of loss in a smuggling operation. It is inconceivable to us that Burchinal would loan any of his aircraft to Platshorn. We uphold respondent's determination as to the Viking airplane. Respondent also determined that Platshorn bought a Martin 202 airplane for $ 40,000 as well as a used fuel truck for $ 5,000 for refueling the plane. Platshorn's purpose was to import between 5,000 and 7,500 pounds of marijuana, an attempt which failed when the Martin 202 was lost in a crash landing in Colombia in 1978, as further described below. Both vehicles were obtained from Burchinal. Platshorn testified that the airplane belonged to Burchinal. Again, on the basis of all the facts in the record, we find that Platshorn was the actual owner of the Martin 202 aircraft and the fuel truck. We uphold respondent's determination that the purchase price of the Martin 202 airplane and the truck represented taxable income to petitioners. With regard to the issue of petitioners' entitlement to deductible losses with respect to this equipment, we have previously considered and rejected it. B. Payment *794 of Bribe for the Release of Purvis
At the end of January 1978, Purvis flew to Colombia to pick up a load of marijuana in the Martin 202, accompanied by Carl London and Steve Cassidy. After establishing contact with Raul Davila, by using the code word "Black Tuna", Purvis and the other men crash-landed on a primitive airstrip in the Colombian jungle. Respondent's notice of deficiency contains the determination of $ 18,000 income attributed to "Ransom paid by Purvis -- Colombia". The record contains not a scintilla of evidence that such a ransom was paid. On brief, respondent does not address the issue of a bribe paid by Purvis. Consistent with our findings above, we are convinced that payments which Davila routinely made to the Colombian authorities were primarily for his own benefit. If Platshorn did not receive imputed income as a result of Davila's liberating him from Colombian custody, he cannot be said to have imputed income as a result of the liberation of his employee Purvis. On the basis of the record, we find for petitioner on this issue. IV. Addition to Tax for Fraud
The final issue for decision is whether petitioners are liable for the addition to tax *795 for fraud. Section 6653(b) provides for an addition to tax equal to 50 percent of the underpayment in a case where any part of the underpayment is due to fraud. Respondent has the burden of proving fraud with intent to evade tax by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111 (1983). Respondent must establish by clear and convincing evidence (1) that there is an underpayment of tax, and (2) that a portion of the underpayment was due to fraud. Rule 142(b); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). For the years at issue, the addition to tax for fraud attaches to the entire deficiency where it is shown that at least some part of the underpayment *796 is attributable to fraud. Sec. 6653(b). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be imputed or presumed, but must be established by independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). Fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts, as direct proof of a taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra.The taxpayer's entire course of conduct may be examined to establish the requisite intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. *797 The intent to conceal or mislead may be inferred from a pattern of conduct. Spies v. Commissioner, supra at 499. A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137 (1954). Other badges of fraud include: Failing to maintain adequate books and records; failing to file income tax returns; giving implausible or inconsistent explanations of behavior; concealing assets; failing to cooperate with tax authorities; engaging in illegal activities; dealing in cash; and failing to make estimated tax payments. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. We are convinced that the totality of the evidence in this case establishes the existence of fraud. Petitioners were engaged in illegal drug traffic, an occupation which, of necessity, involves a substantial element of concealment from authorities. That petitioners' unreported income was from illegal activities is evidence of a motive to *798 evade tax. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Williams v. Commissioner, T.C. Memo. 1992-153. Petitioners' method of conducting their clandestine enterprise was to maintain maximum secrecy: the left hand was not to know what the right hand was doing. Hence they dealt largely in cash and allowed their employees to know only so much as was necessary for them to perform their functions. Their assets were generally not held in their own names. Petitioners maintained legitimate businesses through which they could channel funds from their illicit business. They also offered testimony of an undocumented charter business to help account for their income. At trial and on brief, petitioners gave inconsistent and incredible testimony to explain their activities. Failure to maintain adequate books and records, or maintaining at most surreptitious records, was part of petitioners' modus operandi. Such a failure has long been regarded as a badge of fraud, indicating a course of action designed to evade tax. Parsons v. Commissioner, 43 T.C. 378, 395 (1964). *799 In conjunction with failure to report large amounts of income, it is a particularly strong indication of fraud. Otsuki v. Commissioner, supra at 109-110. Prior to their indictment, petitioners filed false income tax returns, providing incomplete information to their accountant, and made minimal estimated tax payments. After indictment in tax year 1978, Platshorn ceased filing Federal income tax returns. On the basis of petitioners' pattern of conduct, we conclude that respondent has established by clear and convincing evidence that petitioners engaged in fraud with intent to evade tax. Respondent has clearly established that petitioners had unreported income. Petitioners have not come forward with evidence of allowable deductions; this is evidence to which they have most ready access. We also conclude that respondent has established an underpayment of tax for 1977 by each petitioner and by Platshorn for 1978. Accordingly, we hold that both petitioners are liable for the addition to tax for fraud provided in section 6653(b) for 1977 and that petitioner Platshorn is also so liable for 1978. However, petitioners are not liable for the additions *800 to tax for fraud for 1976 because respondent failed to establish an underpayment of tax for that year. Decisions will be entered under Rule 155. Footnotes
1. Platshorn did not file a Federal income tax return for 1978. Petitioners may be entitled to an ordinary and necessary business deduction for this expenditure, as well as for certain other expenditures such as Purvis' equipment purchase described below, but did not raise the issue at trial or on brief.
[2] In the Amended Answer, respondent alleges that the Pacifier↩ was purchased in 1977.
1. In the Answer, respondent increased this figure to $ 233,897 without explanation.↩
1. In Bonner v. City of Prichard, 661 F.2d 1206↩ (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted, as precedent, all decisions of the former United States Court of Appeals for the Fifth Circuit decided prior to Oct. 1, 1981.
3. Floorplanning is a method by which an auto dealership finances its inventory through secured loans.↩